Filed 7/22/15  P. v. Anderson CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GETZ ANDERSON et al.,<br><br>    Defendants and Appellants. | B251527<br><br>(Los Angeles County<br>Super. Ct. No. BA368517) |

APPEALS from judgments of the Superior Court of Los Angeles County. Stephen A. Marcus, Judge.  Affirmed.

Charolette E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Getz Anderson.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant Allen Cox.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Getz Anderson (Anderson) and Allen Cox (Cox) (collectively defendants) appeal from judgments entered following their convictions of attempted murder and other felony offenses. Each defendant generally joins in each other's arguments, and both defendants challenge the denial of *Wheeler/Batson* motions.[1]

Cox separately contends: that the prosecution's failure to identify the true name of attempted murder victim "John Doe" resulted in a potential double jeopardy violation and a violation of Penal Code section 954;[2] that the trial court's failure to instruct the jury that it must unanimously agree on the identity of John Doe violated his right to due process; that the trial court erred in giving a "kill zone" jury instruction; and that jurors engaged in misconduct in the first trial by discussing their anxiety about the length of the trial.

Anderson contends: that the trial court erred to his prejudice by instructing the jury that it could base liability on the uncharged, nonexistent crime of conspiracy to commit attempted murder; that the jury's finding that the crimes were gang related was not supported by substantial evidence; that the trial court erred in denying his motion for new trial; and that reversal is required due to asserted cumulative errors.

Finding no merit to defendants' contentions, we affirm the judgments.

## BACKGROUND

### Procedural history

The original six-count information charged defendants and codefendant Trevon Jermaine Brown (Brown) in count 1 with the willful, deliberate, and premeditated attempted murder of Steve Farias (Farias), in violation of sections 664 and 187, subdivision (a), and in count 6, with the willful, deliberate, and premeditated attempted murder of "John Doe," a rival gang member. Defendants were also charged in count 5 with shooting at an inhabited dwelling in violation of section 246. Cox alone was charged in count 2 with violation of Vehicle Code section 10851, subdivision (a), and in

---

[1] See *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

count 3, with possession of a firearm by a felon in violation of section 12021, subdivision (a)(1). Anderson was charged in count 4 with possession of an assault weapon in violation of section 12280, subdivision (b).

The information also specially alleged as to counts 1 and 5, that Anderson personally inflicted great bodily injury on Farias. As to all counts, it was alleged pursuant to section 186.22, subdivision (b), that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members. It was further alleged that Anderson and a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e), and that Anderson and a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1), causing great bodily injury to Farias, within the meaning of section 12022.53, subdivision (d).

At defendants' first jury trial in 2011, the jury found Cox guilty of possession of a firearm by a felon (count 3), and found Anderson guilty of possession of an assault weapon (count 4). The jury found true the gang allegation attached to both counts. However, the jury was unable to reach verdicts as to the remaining counts and the trial court declared a mistrial. The court granted the prosecution's motion to dismiss count 2, and ordered a retrial on counts 1, 5, and 6.[3]

The second jury trial commenced in July 2013 and resulted in guilty verdicts against defendants on the remaining three counts. As to Cox, the jury found true all the special allegations. As to Anderson, the jury found true the premeditation and gang allegations, as well as the firearm allegations regarding a principal, and the allegation that

---

[3]    Brown did not participate in the second trial and is not a party to this appeal. The information was amended to renumber the counts. Count 1 (attempted murder) remained the same; shooting at an inhabited dwelling, originally count 5, became count 2; and the second attempted murder count (originally count 6) became count 3, resulting in two count 3's. Although the court used the amended count numbers in its oral pronouncement of sentence, the clerk kept the original count numbers for the abstracts of judgment.

3

he personally used a firearm. The jury rejected the allegations that Anderson personally and intentionally discharged a firearm causing great bodily injury.

Both defendants were sentenced on September 5, 2013. Anderson was sentenced to two consecutive life terms in prison for the attempted murders, both with consecutive firearm enhancements of 25 years to life. Remaining firearm enhancements were stayed pursuant to section 12022.53, subdivision (f). The trial court imposed a term of 15 years to life plus a 10-year firearm enhancement as to the original count 5 (violation of section 246), and stayed the term under section 654. As to count 4, the court imposed the high term of three years with a four-year gang enhancement, to run currently with the terms imposed for the attempted murders. The court imposed mandatory fines and fees, ordered print impressions and DNA samples, terminated probation in another case, and granted presentence custody credit.

Cox also received two consecutive life terms for the attempted murders, plus a consecutive firearm enhancement of 25 years to life, with the remaining firearm enhancements stayed. As to the original count 5, the court imposed a term of 15 years to life and stayed the term under section 654. As to the original count 3, felon in possession of a firearm, the court imposed the high term of three years plus a gang enhancement of four years, to run concurrently with the terms imposed for the attempted murder counts. The court imposed mandatory fines and fees, ordered print impressions and DNA samples, and awarded Cox presentence custody credit. Probation was terminated in Cox's two other cases.

Both defendants filed timely notices of appeal.

**Prosecution evidence**

*The shooting and investigation*

Around midnight on February 26, 2010, Farias was visiting at a friend's home near the intersection of 43rd Place and San Pedro Street. Farias testified that he was with Jerome Stevens (Stevens) on his porch with their friends Tradeon, "Tito," and "Chato," when a blue Chrysler slowly passed by. About 10 to 20 minutes later, two African-American men appeared on foot near the house. One of the two men took a firearm

4

resembling an Uzi from his waist, loaded the gun with an ammunition clip, took two steps toward Farias and his friends who were within two or three feet of him, and fired the gun in their direction. As Farias ran to the back of the house he was struck in the leg by a bullet.

Farias told the police that the driver's side windows of the Chrysler were down when it passed the house and he was able to identify Cox as the driver and Anderson as the shooter from photographic line-up. Farias also told officers that one of the men yelled out something like, "Fuck these fools," just before the shooting began. Farias was a reluctant witness, claimed not to remember many details, and denied that he heard anyone shout gang names. Farias also denied that he or any of his four friends belonged to a gang.

Stevens's stepfather, Kenneth Murphy (Murphy), testified that he was in his living room while Stevens was outside with his friends, when he heard five or six gunshots. When he saw Farias come in through the back door with a leg wound, he called 911. When Murphy later inspected his house, he found two new bullet holes. One hole was over the trash area and the other was in the wall outside a bedroom. Los Angeles Police Officer Kevin Raines inspected the area after the shooting and observed seven bullet strikes in and around Stevens's house.

Officer Juan Arenas was on patrol with his partner, Officer Gerard Reygosa in the neighborhood of the shooting, when just after midnight he heard approximately five or six gunshots in rapid succession. As the officers sped toward the sound, they saw a blue Chrysler with no license plate. They also received a radio call regarding a shooting in the area. The officers pursued the blue Chrysler, which accelerated when the patrol car's lights and siren were activated. Soon the Chrysler slowed down and men got out and fled. The front seat occupant wore a black sweatshirt, and the other man, later identified as Brown, wore a checkered shirt. As Officer Arenas gave chase he heard something metallic fall on a hard surface near the fleeing suspect in the black sweatshirt, whom he later identified as Anderson. The Chrysler had collided with a pole and come to a stop. It had only paper dealer license plates.

Officer Arenas caught up with Brown, took him into custody, and returned to the area and found a high capacity firearm magazine containing five nine-millimeter rounds. The police set up a perimeter and Officer Reygosa recovered a handgun within the boundary. Officers also found a baseball cap and a black sweatshirt that had been discarded behind a residence on 48th Street.

Officer Raygosa testified that he saw four men get out of the Chrysler and flee. A handgun fell from the driver's midsection onto the street and Officer Raygosa later recovered a Glock 26 semiautomatic handgun with an empty magazine in the same area. As he ran, the driver was wearing the same black sweatshirt that Officer Arenas recovered later in a nearby backyard. Officer Raygosa identified Brown as the suspect who exited the Chrysler from passenger side. After Brown was detained police found no weapons, but recovered a USB flash drive from his person.

A neighborhood resident reported seeing a man hide under a car and then run away as he discarded the dark-colored sweatshirt he wore over a white T-shirt. Officers maintaining the perimeter that night searched the area for clothing and checked all vehicles leaving the perimeter. A second black sweatshirt was found near a trash can in the area. Cox was found hiding in the trunk of a car leaving the area, and Anderson was found in the back seat of another car. Cox was wearing a white shirt when he was taken into custody.

Forensic analysis revealed that Cox was a possible contributor to the DNA mixture recovered from the Glock handgun, one black sweatshirt, and the baseball cap found within the perimeter. Anderson was a possible contributor to the DNA recovered from the other black sweatshirt. Several fingerprints found outside the front passenger window of the Chrysler were determined to belong to Cox. A firearms expert test fired the Glock handgun and concluded that it had fired the four nine-millimeter casings found at the scene of the shooting. The expert also examined the recovered assault pistol, and testified that it was an Interdynamic semiautomatic assault pistol, which resembles an Uzi and a MAC 11 assault weapon. The gun was operational but had jammed with a bullet in

6

the chamber, possibly due to the use of a large capacity magazine which was not designed for that firearm.

Detective Eric Rose testified that after Anderson and Cox were arrested he arranged to have them placed in the same holding cell where officers monitored and recorded their conversations and telephone calls. Excerpts of the recordings were played for the jury. Cox told Anderson in one conversation that that police had the "burner" (slang for gun) and in another conversation Anderson said that they had the "Glock."

In a telephone conversation Anderson asked "Bay-Bo" to pick up his "macaroni jeans" that was in a shopping cart behind "Lil Rag's" house. Detective Rose testified that "macaroni" referred to a "MAC 11" type assault weapon, and that Lil' Rag was Richard Beckner (Beckner), a person who had admitted several times to the detective that he was a member of the 5-3 Avalon Gangster Crip gang.[4] The detective also believed that Anderson and Cox were members of the same gang. Thus, when Detective Rose heard mention of the shopping cart in the jailhouse recordings, he went to Beckner's home. There he found a shopping cart on the sidewalk. After looking under several black trash bags an assault weapon was found. The weapon appeared to be jammed with a nine-millimeter bullet.

In other excerpts from the recordings Anderson expressed the hope that the police had not found "that mother fuckin' jacket" and that his friends would say he was with them during the shooting, because "we need, an alibi, bad." Cox described how he saw Anderson attempt to "shoot that motherfucker." Cox also spoke about trying to drive away, seeing the police, and then running and hiding.

### Defendants' gang membership

While conducting pedestrian stops during a narcotics and gang suppression assignment on February 4, 2010, Officer John Carlyle spoke to Brown in the South Park

---

**4** Throughout the trial, various witnesses referred to the same gang as the Five Tres Avalon Gangster Crip gang, the Five Trey Avalon Gangster Crip gang, the Avalon Gangster Crip gang, and more simply the Avalon gang. In referring to the full name of the gang, we use the most commonly used spelling in the record, which was Five Tres Avalon Gangster Crip gang.

neighborhood of Los Angeles. Officer Carlyle testified that Brown acknowledged being a member of the Five Tres Avalon Gangster Crip gang for two years.

Officer Joseph Fransen, testified that in 2009 and 2010, he was a gang officer assigned to monitor gang activity in the South Park neighborhood, which was the territory of the Five Tres Avalon Gangster Crip gang. In the course of his work he contacted approximately 50 members of the gang and developed a rapport with many of them. During Officer Fransen's several encounters with Cox, the latter admitted his membership in the Five Tres Avalon Gangster Crip gang. One such encounter occurred in October 2009, when Cox not only admitted being a member of the gang but claimed the moniker "Low Key."[5] On one occasion Cox was wearing a baseball cap embroidered with the "A" logo of the Atlanta Braves, meant to signify Avalon. Officer Fransen also observed gang tattoos on Cox, including an "A" with a halo over it, and the numbers five and three in roman numerals on the back of his arms. At times, Officer Fransen encountered Cox in the company of other gang members, including Devaughn Banner and Cedrick Thomson, both self-admitted members of the Five Tres Avalon Gangster Crips, and Cox's brother, Anthony Cox (Anthony). Officer Fransen explained that in gang culture, publicly associating with other known members of the same gang within their gang's territory was a sign of allegiance to the gang.

Officer Fransen also had contacts with Anderson in the company of other gang members in the South Park area during 2009 and 2010. When he encountered Anderson in South Park in October 2009, Cox was not there, but Banner was, the same member of the Five Tres Avalon Gangster Crip gang he had found in Cox's company. Anderson admitted being a member of the Five Tres Avalon Gangster Crip gang, and gave his moniker as "Baby Chaotic." Officer Fransen recalled Anderson wearing a coat with "SP" for South Park embroidered on it, but did not recall seeing any gang tattoos.

---

[5] Officer Fransen explained that a moniker was a nickname used within a gang member's gang. In gang culture a moniker signified allegiance to the gang and acceptance by fellow gang members. As far as he was aware, people who were not members of the gang were not allowed to have gang monikers.

*Gang expert*

Officer Jesse Drenckhahn testified as the prosecution's gang expert. Officer Drenckhahn had gained knowledge of the Five Tres Avalon Gangster Crip gang while assigned to patrol in 2007, and while assigned to the Newton Division Gang Enforcement Unit from October 2008 through October 2010. During that period he had significant contact with the gang. His responsibilities included gathering intelligence, identifying and documenting gang members, staying current on trends and tattoos, documenting graffiti, and photographing members. In February 2010, there were an estimated 100 members of the gang, and Officer Drenckhahn had personally contacted about 60 of them.

Many criminal street gangs operated in the Newton Division. The Five Tres Avalon Gangster Crip gang feuded with Blood gangs and several of the other Crip gangs in the area. The shooting in this case occurred within the territory claimed by the Four Deuce Four Tres 48 Gangster Crips, the primary rivals of the Five Tres Avalon Gangster Crip gang. The crime scene was adjacent to the Gilbert Lindsey Park, where the Four Duce Four Tres 48 Gangster Crip gang members were known to congregate. In Officer Drenckhahn's experience, it would demonstrate disrespect for a gang member to venture into the territory of a rival gang, and even innocent entries into the area could result in a dangerous confrontation.

Officer Drenckhahn explained that the notion of respect was very important to gangs and had a special meaning in gang culture, where respect was equated with fear and intimidation earned through criminal activity. To be disrespected made a gang appear weak, which would damage the reputation of the gang and its members. Thus, to earn respect, gangs engaged in aggressive, violent, and intimidating activities that spread fear in the community; the more heinous the crime, the greater the respect earned for the gang and the member who committed it. The resulting benefit to the gang was the reluctance of residents to cooperate with police investigations, testify, or identify gang members due to fear of retaliation, thus allowing gang members to engage in narcotic sales and commit robberies and other crimes openly. An individual gang member

generally gained the respect of his gang by committing violent crimes, such as shooting and assaulting rival gang members, thereby demonstrating allegiance to the gang and fellow gang members.

The primary activities of the Five Tres Avalon Gangster Crip gang were assault, robbery, narcotic sales, and illegal firearm possession. Officer Drenckhahn presented certified records of the convictions of Devaughn Banner, for assault with a deadly weapon in December 2009, and Jerry Green, found to be a felon in possession of a firearm in January 2010. Both Banner and Green were admitted members of the Five Tres Avalon Gangster Crip gang.

Officer Drenckhahn described the Five Tres Avalon Gangster Crip gang's common signs or symbols which were frequently found in graffiti and tattoos, including the number 53, the abbreviation "AGC" for Avalon Gangster Crip, "East Side" for East Side Crips, and South Park. More subtle tattoos included dice displaying a five and a three and a street sign for 53rd Street. Five Tres Avalon Gangster Crip gang members often wore clothing identifying them as members of the gang, such as baseball caps with the logos of the Los Angeles Angels of Anaheim or Oakland A's. Community residents learned to recognize members of the gang by the areas where they congregated, their clothing, their use of the number 53, the "A" hats, and the color blue.

Officer Drenckhahn opined that Brown, Anderson, and Cox were members of the Five Tres Avalon Gangster Crip gang, and he explained the factual basis for his opinions. Officer Drenckhahn described his contact with Brown in February 2010 in South Park, the "epicenter" of the gang's territory, when Brown admitted to Officer Drenckhahn that he was a member of the gang and said his moniker was "Baby Tres." Brown was wearing a blue belt with a chrome belt buckle bearing the letter A, and one of his companions wore a baseball cap with an A on it. He was in the company of John Edwards, Lou Dixon, James Thomas, and Cox's brother Anthony, all members of the Five Tres Avalon Gangster Crip gang. In addition, Officer Drenckhahn reviewed the flash drive found on Brown. The drive contained items with gang significance: the Angel's "A" logo; the Oakland A's logo; an image from the South Park television show;

10

and photographs of Anthony and others making hand signs used by the Five Tres Avalon Gangster Crip gang. It also contained a party flyer with the word "kiccbacc," which demonstrated the Crip gang's avoidance of placing a C and K side by side, because that could mean Crip Killer.

Officer Drenckhahn based his opinion that Anderson was a member of the gang on past law enforcement contacts with him, his observation of Anderson's tattoos and clothing, and Officer Fransen's testimony. Officer Drenckhahn testified that he had known Anderson since late 2007 or early 2008, and had seen or talked to him personally at least 20 times in Five Tres Avalon Gangster Crip territory. On May 3, 2009, Officer Drenckhahn observed Anderson at the gang's 2009 annual "Hood Day" gathering at South Park, where participants typically wore their gang colors. Anderson was wearing a jersey with his moniker "Baby Chaotic" on it. Another encounter with Anderson was in April 2009 while Anderson was in the company of other members of the Five Tres Avalon Gangster Crip gang. In June 2009, another officer documented his contact with Anderson in South Park with other members of the gang, including the same Jerry Green whose record of conviction was admitted to show that gang engaged in a pattern of criminal conduct. Officer Drenckhahn identified photographs of Anderson's tattoos of a 5 and 3, and "South Park" and he explained their gang significance.

Officer Drenckhahn testified that he had come into contact with Cox about 20 times, including the day of the 2009 Hood Day celebration, where Cox was in the company of Green, Banner, and other gang members. Officer Drenckhahn identified a photograph from that day in which most of the people depicted were wearing blue. Cox and others were shown displaying a gang sign in the photograph, and Banner was wearing a shirt with the moniker "Baby Shady." Prior to that, in October 2008, Cox admitted to Officer Drenckhahn that he was a member of the Five Tres Avalon Gangster Crip gang and said his moniker was "Little Blue." At that time Cox was with Banner and other gang members who Officer Drenckhahn saw with Anderson in April 2009. In February 2008, Officer Drenckhahn encountered Cox in the company of Green in South Park. Cox was wearing a blue shirt, blue pants, and blue shoes. He admitted his

11

membership in the Five Tres Avalon Gangster Crip gang and that his moniker was Low Key. Officer Drenckhahn identified photographs of Cox's gang related tattoos, including "A5AL3N" which represented the word Avalon, but with the numbers 5 and 3 replacing two of the letters, a Roman numeral V on right forearm and a III on the left forearm. Cox and his brother Anthony both had the letters "FTAG" tattooed on them, which stood for Five Trey Avalon Gangster.

Officer Drenckhahn explained that in gang culture a "mission" meant committing crimes on behalf of the gang, usually with other gang members. Gang members would typically anticipate a confrontation during missions into rival territory, and thus would bring along fellow gang members for support, and confidence, and to verify the mission. Gang members on a mission in rival territory typically either targeted known rivals or went to areas where rivals were known to congregate, and then shot indiscriminately at anyone fitting the description of a rival gang member. Boasting about missions enhanced the member's reputation and standing within the gang. Each member would have his own responsibility on a mission, such as driving the getaway car, doing the shooting, or being the lookout, and each member should know his role. Each participant would be expected to back up the others and to protect them to the best of his ability. Further, if caught, gang members would be expected to obstruct the police investigation in order to avoid getting the reputation as a "snitch." Officer Drenckhahn explained that snitches would be subject to discipline within the gang for cooperating with law enforcement which could include being shot or killed.

The prosecutor posed a hypothetical question in which three, possibly four members of the Five Tres Avalon Gangster Crip gang traveled into the territory of the Four Tres Avalon Gangster Crip gang, one in possession of an assault weapon, and the other with a nine-millimeter weapon; they drove slowly by a house at 43rd and San Pedro Streets, and 20 minutes later, walk up to the house, say something derogatory to young men in front, such as, "Fuck these fools," when the person with the assault weapon points it at one of the young men and fires multiple shots, before getting back into the car with the other members of Five Tres Avalon Gangster Crip gang and speeding away. Officer

12

Drenckhahn was of the opinion that the hypothetical crime was gang related, as the perpetrators went to an area where rival gang members were known to congregate, showed disrespect, shot at them, and then fled. It was a classic drive-by or walk-up mission type shooting.

Officer Drenckhahn was also of the opinion that such a shooting was committed for the benefit of a criminal street gang, because it would enhance the gang's reputation and earn respect for both the perpetrators and the gang in the community, by showing that the gang was willing to commit egregious acts of violence. The gang would benefit by the fear created in the community as word of it spread, leading to reluctance to cooperate with the police and an unwillingness to identify gang members involved in the crime. Officer Drenckhahn's opinion would not change if the gang members did not call out the name of the gang, as gang members may or may not announce the name of their gang while committing a shooting. He had experience with gang crimes committed both ways.

**Defense evidence**

Shandrea Melton (Melton) testified that in February 2010 she lived with Anderson, and on February 25, Anderson was home all day, and did not go out until about midnight when he walked across the street to a party. The police came the next morning and removed things from her apartment, including Anderson's black sweater. Melton did not tell the police or defense counsel prior to trial that Anderson had been with her all day or that night. She confirmed that Anderson was a member of the Avalon gang.

Defense investigator Gary Cooper testified that in a telephone interview with Farias prior to trial, Farias said the blue car was speeding when it passed the front porch, and the driver's side window was less than halfway down. Farias also told him that one of the two men he saw had a Tech Nine machine gun, and that at the time of the photographic lineup, the police informed him that they had caught the driver and had recovered some weapons. Cooper went to the porch and determined that a tree blocked some of the view of the street and when he drove the route taken by the blue car, it took him 73 seconds.

13

Brown testified that he pled guilty in September 2011 to the attempted murder of Farias, and was in custody at the time of this trial. He testified that late on the evening before the shooting he was walking to a bus stop after playing basketball at the park, when a car stopped and the back seat passenger asked him if he needed a ride. Brown recognized the person as someone he had seen playing basketball at South Park, so he got into the car. Brown claimed that the back seat passenger was wearing a bright red shirt and a light silver-gray sweater, and that the driver had a beard that connected with his sideburns; however he admitted that during his interview with police after his arrest he had variously said that the rear passenger was clean shaven and that he had a mustache but no beard.

Brown said that the car stopped in an unfamiliar residential area and the front and rear passenger stepped out and walked away from the car. Brown saw something black in the hands of the rear passenger, but did not see anything in the other man's hands. About 30 seconds later Brown heard gunshots, ducked down, and did not see what happened. The two passengers then came back to the car, and they drove away. When the police later came up behind them, the driver continued to drive for a short time before stopping. Brown fled because he was shocked and scared and the police officers had their guns out. After a few steps an officer told him to stop, he complied, and the police grabbed him.

Brown denied knowing Anderson or Cox in February 2010, and denied knowing the other people in the car. When defense counsel identified Anderson and Cox in court, Brown testified that they had not been among the three people in the car. He claimed to have met defendants for the first time in court about a month after his arrest and that he had seen only one of the car's occupants before that night. However, when he was interviewed by the police after arrest, Brown admitted he had said that he knew "a couple" of them, having seen them around. Brown admitted falsely telling the police repeatedly that he had not been anywhere near the gunshots, that he was not in the car, did not know what happened, and that he was not there.

14

Brown testified that he was not a gang member, that he had never told police that he was a gang member, and that he had no gang tattoos. He admitted having met Officers Dracon and De la Cruz while he was in South Park with Anthony Cox and Lou Dixon in February 2010, but denied knowing Anthony or Dixon to be members of the Five Tres Avalon Gangster Crip gang. Brown identified a photograph of himself in South Park in which he is shown wearing a blue belt with an A on the buckle. Anthony Cox was wearing a similar blue belt and buckle that day and Dixon wore a hat with an A on it. When shown a photograph of Anthony's arms, Brown claimed he could not see all his tattoos, despite the fact that Anthony was wearing a short sleeved shirt.

Brown testified he was attending school in February 2010, and the flash drive that was seized by the police contained school documents. When he was shown photographic images from the flash drive, Brown admitted that he created many of them, including a collage with 53, A, and South Park written on a shirt. He admitted that 53 and A stood for Five Tres and Avalon. He admitted taking the photograph of papers containing such words as East Side 53, Avalon, and 53, and that that the writing was gang graffiti, but he explained that it was merely interesting trash he found on the ground. Brown identified other photographs on the flash drive, including one depicting Brown, Anthony Cox, and others displaying Five Tres Avalon Gangster Crip gang signs. Finally, Brown identified the party flyer announcing a "kiccbacc" for February 25, 2010. Although he knew how to spell kickback correctly, he denied that replacing the "ck" with "cc" had any significance.

**Rebuttal**

The prosecution presented testimony regarding the search of the neighborhood after the shooting and the recovery and booking of the sweatshirts.

15

## DISCUSSION

### I. Blanket joinders

Citing California Rules of Court, rule 8.200(a)(5),[6] each defendant provided a "notice of joinder" in their opening briefs. Anderson's notice stated that he joined in all briefs filed by Cox and adopted all of his arguments that might accrue to his benefit, and Cox's notice stated that he joined in all arguments in Anderson's opening brief.

As respondent points out, the California Supreme Court has recently criticized blanket joinders in claims raised in a multiple defendant appeal. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*) ["We strongly disapprove of this seriously improper tactic"]; see also *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.) The court noted that although joinder is broadly permitted, California Rules of Court, rule 8.200(a)(5) is not satisfied by "such cursory and unfocused statements" of joinder, and each defendant continues to have the burden of demonstrating error and prejudice. (*Bryant*, *supra*, at pp. 363-364.) Further, neither the reviewing court nor respondent "is required to divine which aspects of a claim might be adverse to a particular defendant, rendering him unwilling to join the particular claim at issue. Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground." (*Id*. at p. 363.) Finally, the court warned that it would not "assume that each defendant has standing to raise each and every claim raised in the briefs or that he preserved a claim for appeal by taking appropriate and timely action below." (*Id*. at p. 364.)

In reply to respondent's observation, Cox contends that his appellate counsel has in fact "'thoughtfully assess[ed]'" whether such joinder is proper as to the specific claims, and has determined that all joined issues pertain equally to both defendants, with

---

[6] California Rules of Court, rule 8.200(a)(5) provides: "Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal."

no separate prejudice arguments necessary on Cox's part. Anderson also contends that all joined arguments apply equally to both defendants. In addition, Anderson represents that all objections necessary to preserve claims were made by both defendants, and that he will make any necessary additional arguments in his reply brief.

We thus consider each defendant's arguments made solely by joinder only if we are satisfied that they were individually preserved and are sufficient to meet such individual defendant's duty to spell out how the claimed error resulted in a miscarriage of justice as to him. (See *People v. Nero, supra*, 181 Cal.App.4th at p. 510, fn. 11.)

## II. Juror misconduct in first trial

Cox contends that his conviction of felon in possession of a firearm must be reversed due to the misconduct of jurors who complained about the length of the trial and discussed those concerns among themselves. He contends that such a discussion was a violation of the jurors' oaths, duties, and the trial court's many admonitions pursuant to section 1122 not to discuss the case. Cox also contends that the trial court should have granted his motion for mistrial, made on the same ground. In addition to his general joinder, Anderson contends (for the first time in his reply brief) that the trial court erred in denying his motion for new trial, made in part on the same ground.

### A. Proceedings below

On September 22, 2011, after the prosecution rested one month into the first trial, Juror No. 2 asked to speak to the court on behalf of himself and the other jurors, and reminded the judge that his original estimate was that the trial would conclude by September 23. Juror No. 2 expressed the jurors' concern that the trial seemed to have no end and told the court that there was "a sense of frustration" from what seemed to be a "very slow forward progression."

The court explained that the length of the trial was unusual, acknowledged that he and the attorneys seriously underestimated the time it would take, and explained some of the reasons that trials took longer than expected. Juror No. 2 told the court: "I take this very seriously and take the circumstances that these gentlemen are in very, very seriously, and I'm not going to rush a verdict or just agree with other people because

17

that's the way things are going." When Juror No. 2 was questioned a second time, he said that he thought the physical evidence presented was "pretty compelling" and that an "array of character witnesses" would not be as persuasive as the material witnesses. He had not, however, discussed those views with the other jurors, and he assured the court that he had not yet formed a judgment in this case, and "absolutely" still had an open mind. Juror No. 2 stated that he understood and respected the presumption of innocence and the prosecution's burden to prove defendants guilty beyond a reasonable doubt.

Since several other jurors had submitted notes, the trial court decided to inquire of each juror individually to determine whether he or she could render a fair judgment. Juror No. 3 reported that all but one juror had met together to discuss their frustrations about the length of the trial. Juror No. 5 said that the jurors' discussion about their frustrations with the length of the trial was brief. All jurors, except Juror No. 12 and Alternate Juror No. 2, assured the court that that they could remain fair despite their frustrations about time delays and the length of the trial.

Juror No. 12 told the court that he had not participated in the "little meeting" with the other jurors over lunch, but was "extremely concerned" about the duration of the trial because of his "significant financial burden." Asked whether this would affect his deliberations, he said he would do his duty as best as he could, but added, "I'm not going to sacrifice my life for these individuals that I do not know." Alternate Juror No. 2 stated he had "had enough" and had written a note the day before about the financial hardship caused by not being paid at work. He also stated he had already made his decision and believed there was enough evidence upon which to do so, but he denied having discussed this view with other jurors.

Anderson moved for a mistrial on the ground that the jury had disobeyed the court's order not to discuss any matter related to the case "and yet . . . they've gotten together and they've called a meeting." Counsel for Anderson argued, "[W]e don't really know anything about how this meeting occurred and who did it, but it was clearly in violation of an order that this court has given probably a hundred times." Cox joined the

18

motion, and argued that the meeting in which the jurors discussed their frustrations meant that they were talking about the evidence.

The court excused Alternate Juror No. 2, and Juror No. 3. The court denied the motion for mistrial.

### B. Applicable legal principles

A motion for mistrial "should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) We defer to the trial court's factual findings if they are supported by substantial evidence, and we review the court's denial of the mistrial motion for an abuse of discretion. (*Id.* at pp. 283, 299.) With regard to the trial court's denial of a new trial motion based upon alleged juror misconduct, we independently review the ruling as a question of mixed law and fact. (*People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5; see *People v. Ault* (2004) 33 Cal.4th 1250, 1261.)

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293.) Juror misconduct does not render the judgment reversible per se. (*In re Carpenter* (1995) 9 Cal.4th 634, 675.) However, serious juror misconduct will usually give rise to a rebuttable presumption of prejudice. (*Hamilton*, *supra*, at pp. 294-295.)

Serious juror misconduct may occur when jurors discuss among themselves a "'subject connected with the trial'" in violation of their oaths, duties, and admonitions. (*People v. Pierce* (1979) 24 Cal.3d 199, 207.) A subject is not connected to the trial unless "the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant. [Citations.]" (*People v. Federico* (1981) 127 Cal.App.3d 20, 38.) Absent a showing of such content, a conversation among jurors is not serious misconduct and does not give rise to a presumption of prejudice. (*People v. Chavez* (1991) 231 Cal.App.3d 1471, 1484-1485.)

### C. No prejudice presumed or shown

Without supporting authority and contrary to the cases cited above, Cox suggests that expressing frustration over the length of the trial is a "subject connected with the trial." Cox has not shown that the jurors' conversations about the duration of the trial included any discussion of the evidence or any matter relating to the guilt or innocence of the defendants. He merely quotes the supposition of Anderson's counsel that the jurors had discussed "what kind of evidence the defense intended to put on," as well as his own counsel's surmise that the jurors' responses to the trial court's questions meant that "they're talking about the evidence."

The record does not support counsel's conjectures. Juror No. 2 *thought* that the physical evidence was compelling and that any character witnesses presented by the defense would not be as persuasive as the "material" witnesses, but he did not express that thought to any of the other jurors. Similarly, Alternate Juror No. 2 expressed his belief to the court that there was enough evidence to permit a decision, but he denied having discussed this view with other jurors. None of the other jurors expressed an opinion about the evidence, and none reported discussing the evidence or defendants' guilt or innocence. Thus, the unauthorized communications were not about a subject connected with the trial, and prejudice is not presumed. (See *People v. Chavez*, *supra*, 231 Cal.App.3d at pp. 1484-1485.)

Neither defendant contends that there was a likelihood of actual juror bias. (See I*n re Carpenter*, *supra*, 9 Cal.4th at p. 653.) As there was no serious misconduct and no prejudice, presumed or shown, we find no abuse of discretion in denying the mistrial motion, and we independently conclude that the trial court did not err in denying the motion for new trial.

## III. The John Doe contentions

Cox contends that his conviction for attempted murder (count 6) must be reversed because the prosecution failed to reveal the identity of John Doe, the alleged victim in that count.

20

There is no rule that the victim must be identified by his or her true name, "a person who shoots into a group of people, intending to kill one of the group, but not knowing or caring which one, [can] be convicted of attempted murder . . . . The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being." (*People v. Stone* (2009) 46 Cal.4th 131, 134.) "If the defendant is accused of attempted murder of someone, although not necessarily a specific person, it would be sufficient to allege enough facts to give notice of the incident referred to and that the defendant is charged with attempted murder. For example, . . . it would [be] sufficient to allege that defendant committed attempted murder, in that on or about [a specific date], he attempted to murder a member of a group of persons gathered together [in a particular location]. Although other ways to charge a case like this no doubt exist, a charge like this example would provide adequate notice of the offense of which defendant was accused." (*Id*. at pp. 141-142.)

Despite this general rule, Cox argues that not knowing the identity of John Doe deprived him of due process, potentially placed him in double jeopardy, possibly resulted in a nonunanimous verdict, and in effect, violated section 954 by alleging more than one act or victim in a single count.[7]

Respondent contends that Cox has forfeited these contentions by failing to object to the charging documents in the trial court. Objections to accusatory pleadings on the ground of uncertainty must be raised by demurrer, and failure to do so results in forfeiture of the issue on appeal. (*People v. Jennings* (1991) 53 Cal.3d 334, 356-357; § 1004, subd. (2); § 1012.) This rule of forfeiture applies to claims that the pleading of insufficient particulars resulted in a lack of notice. (See *People v. Ramirez* (2003) 109 Cal.App.4th 992, 997.) Further, a double jeopardy claim must be raised at the time the defendant enters a plea. (*People v. Scott* (1997) 15 Cal.4th 1188, 1201.) Finally, the forfeiture rule

---

[7] In relevant part, section 954 provides: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, *under separate counts* . . . ." (Italics added.)

21

applies to the allegation of multiple acts in one count, as prohibited by section 954. (§ 1004, subd.(2); § 1012; *People v. McNeill* (1980) 112 Cal.App.3d 330, 334-335 (*McNeill*).) Thus, we find that Cox has forfeited his John Doe contentions.

Anderson expressly joins in Cox's double jeopardy argument, although he concedes he did not object on that ground. Anderson contends that we should nevertheless reach the double jeopardy issue because the failure to identify John Doe had the additional consequence of violating the constitution by potentially placing him in double jeopardy. In the only authority Anderson cites for this proposition, the California Supreme Court explained that constitutional arguments advanced for the first time on appeal are not forfeited when the "'new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong *for the reasons actually presented to that court*, had the additional *legal consequence* of violating the Constitution.'" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 138, fn. 6, first italics added.) As Anderson has failed to demonstrate that he objected to the charging documents or otherwise brought the issue to the trial court's attention, he is arguing, in essence, that a forfeited potential double jeopardy violation was an additional consequence of a forfeited due process violation. We read nothing in the Supreme Court's explanation that would permit the assertion of a forfeited constitutional violation as an additional consequence of another forfeited constitutional violation.

In any event Cox's argument is that he might be subject to double jeopardy "in case additional charges are brought"; and neither he nor Anderson has demonstrated that a potential double jeopardy violation in some possible future prosecution is a consequence suffered as a result of the John Doe allegation. We thus agree with respondent that defendants' double jeopardy claims are purely speculative. (Cf. *People v. Sloan* (2007) 42 Cal.4th 110, 120 [no double jeopardy violation when future conviction and sentencing remain speculative]; *People v. Sanchez* (2001) 24 Cal.4th 983, 993 [double jeopardy contention not reached, as the court was "not faced with that question in the present case"].)

Cox attempts to counter the claim of forfeiture by denying he has ever contended that the accusatory pleading must provide the name of the victim or that the victim must be otherwise identified. Cox concedes that "the information on its face is not inadequate"; but he then incongruously claims that his true concern is that pursuant to section 954, "an information cannot allege more than one victim per count." Cox argues he had no reason to demur to the information, because "[w]hat *became* unconstitutional as the trial unfolded was the prosecution's argument after the testimony of Steve Farias, that the John Doe in count six (renumbered count three) could have been anyone of four different people." (Italics added.)[8]

It seems then that Cox contends that prosecutorial misconduct gave rise to the trial court's obligation to instruct the jury that it must unanimously agree which of the four people defendants intended to kill. Such an argument does not resolve the forfeiture issue. "In order to preserve a claim of prosecutorial misconduct for appeal, the defense must make a timely objection at trial and request an admonition. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1146.) Cox did not object to the prosecutor's argument or request an admonition.

Cox also suggests that the prosecutor's argument gave rise to the trial court's sua sponte obligation to craft and give a pinpoint unanimity instruction regarding the four individuals. Cox cites the general rule that "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Cox then relies on a comparison with *McNeill*, where the trial court failed to give a unanimity instruction. There, an exception to the forfeiture rule

---

[8]    The prosecutor was attempting to explain the "kill zone" theory of concurrent intent. Under that theory, a defendant may be convicted of attempted murder if he intended to kill a primary victim by killing everyone in that victim's vicinity. (See *People v. Stone, supra*, 46 Cal.4th at pp. 136-138.) In addition, a defendant who directs lethal force at a group of people in close proximity "can be convicted of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill. [Citation.]" (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798-799.)

23

arose in the absence of an appropriate instruction, when the inclusion of multiple victims in one count could have resulted in a verdict rendered by jurors who did not unanimously agree on the act constituting the charged offense. (*McNeill, supra*, 112 Cal.App.3d at pp. 335-336.) *McNeill* does not provide an apt comparison. First, unlike here, the information in that case was defective, as a single count charged the defendant with assault upon four victims, not one John Doe; and second, the *McNeill* trial court instructed the jury that it could convict the defendant of assault if it found "'that defendant committed these acts on only one of the named individuals.'" (*Id*. at pp. 334-335.) Here, the information was not defective and the trial court did not instruct the jury that it could find that a defendant attempted to murder John Doe if he attempted to murder any one of the four companions.

"The unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.) Thus, no unanimity instruction is required where the continuous course of conduct consisted of repeatedly firing a weapon directly at a group of people with the intent to kill any or all of them. (*People v. Ervine* (2009) 47 Cal.4th 745, 788; see *People v. Flores* (2007) 157 Cal.App.4th 216, 223.) Here, in a continuous course of conduct, the shooter fired multiple shots in the direction of Farias and his four friends who were within two or three feet of Farias. Cox presented the same defense to the two attempted murder charges: that Cox was not there. Cox does not claim that he would have presented any different defense with regard to Farias or any of his four companions.

We conclude the trial court was not required to give a sua sponte special unanimity instruction regarding the four companions; and as Cox has conceded that the information was not defective, we need not reach his pleading issues.

24

**IV.** *Wheeler/Batson*

Anderson contends that the prosecutor used peremptory challenges in both the first and second trials to systematically exclude African-Americans from the jury, and that he was deprived of his right to a jury trial as guaranteed by the United States Constitution by the trial court's denial of defendants' *Wheeler/Batson* motions to strike the panel. In addition to his blanket joinder, Cox contends that he was denied an adequate record to permit meaningful appellate review of the motions.

### A. Applicable legal principles

#### 1. Three-step inquiry

The use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias violates both the state and federal Constitutions. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; *Batson*, *supra*, 476 U.S. at p. 89.) In reviewing a *Wheeler/Batson* motion, the trial court engages in a three-step inquiry: first, the objecting party must make a prima facie showing of prohibited group bias; second, the burden shifts to the party who exercised the peremptory challenge to give a nondiscriminatory reason; and in the third step, the trial court evaluates the proffered reasons and determines whether the objecting party has proven purposeful discrimination. (*People v. Silva* (2001) 25 Cal.4th 345, 384; *Purkett v. Elem* (1995) 514 U.S. 765, 767.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

#### 2. Standard of review

In both trials, the trial court found that the defense made a prima facie showing as to each of the prosecutor's challenges and required the prosecutor to articulate reasons for them. The court then found each challenge was justified with a nondiscriminatory reason. Defendants' contentions relate to the third-stage inquiry to determine whether defendants proved purposeful discrimination. (See *People v. Silva, supra*, 25 Cal.4th at p. 384; *Purkett v. Elem, supra*, 514 U.S. at p. 767.)

"'[T]he critical question in determining whether a [defendant] has proved purposeful discrimination' at a third-stage inquiry 'is the persuasiveness of the prosecutor's justification for his peremptory strike . . .' [and] whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citations.]  (*People v. Riccardi* (2012) 54 Cal.4th 758, 787 (*Riccardi*), quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339.)  ""'As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"'  [Citations.]" (*Riccardi, supra*, at p.787.)  "'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]' [Citation.]" (*Lenix, supra*, 44 Cal.4th at pp. 613-614, fn. omitted.)

"Accordingly, because the trial court is 'well positioned' to ascertain the credibility of the prosecutor's explanations and a reviewing court only has transcripts at its disposal, on appeal '"the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous.' [Citations.]" (*Riccardi, supra*, 54 Cal.4th at p.787; *Miller-El v. Cockrell, supra*, 537 U.S. at p. 339-340.)

### B.  First trial

#### 1.  Challenge and ruling

When the prosecutor struck prospective Juror No. 7117 from the panel, Anderson's counsel objected.  There remained three other African-American jurors on the panel at that time, and the prosecutor represented that Juror No. 7117 was the first

African-American excused.  The trial court found a prima facie showing and heard the prosecutor's reasons for excusing Juror No. 7117.[9]

The prosecutor explained her negative feeling about Juror No. 7117 from the beginning:  when Juror No. 7117 was asked to describe her impressions of the defendants as she entered the courtroom for the first time, she stated that she thought the defendants were three nice-looking, clean-cut young men.  Because one of the defendants was a juvenile, the prosecutor expressed concern that his counsel would use that to create sympathy for him.  She also pointed out that she had previously excused 10 other jurors because their comments suggested sympathy toward the defendants given their youth.  The prosecutor also thought that Juror No. 7117 had "puff[ed] up" her occupation by saying she was in aerospace, and later clarified that she was a data processor in the aerospace industry.  Additionally, the prosecutor noticed that Juror No. 7117 had few interactions with others in the hallway and had not made friends with the other jurors, as well as seeming animated and attentive to defense topics and questions, but not so animated during prosecution questions.  In sum, the prosecutor explained, her overall impression was that Juror No. 7117 was a pro-defense juror.

The trial court found that Juror No. 7117's comments about the defendants' youth and other things justified the prosecutor's concern that she would be sympathetic.  The court then overruled the *Wheeler/Batson* objection.

### 2. Comparative analysis and inadequate record

Anderson suggests that it is appropriate to review the trial court's ruling by undertaking a comparative juror analysis of the first trial's jury selection, although neither defendant made such an analysis in the trial court.  A "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Lenix, supra*, 44 Cal.4th at p. 622.)

---

[9]     In his opening brief, Anderson states that the prosecutor excused two African-American women prior to challenging Juror No. 7117, and defense counsel argued to the trial court that two of the prosecutor's challenges had been African-American, but the record does not support this claim.

27

Comparisons to accepted jurors may tend to show purposeful discrimination "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241; see also *Lenix*, at p. 621.)

Anderson relies on *People v. Williams* (2013) 56 Cal.4th 630, in which the California Supreme Court restated the rule that a "comparative juror analysis must be considered for the first time on appeal while reviewing third stage *Batson/Wheeler* claims when a defendant relies on such evidence *and the record is adequate to permit the comparisons*. [Citation.]" (*Id.* at p. 661, citing *Lenix, supra*, 44 Cal.4th at p. 607, italics added.) Even then, when no comparative analysis was made in the trial court, appellate review is necessarily circumscribed. (*Lenix, supra*, at pp. 622, 624.) "Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. [Citation.]" (*Id.* at p. 624; see also *Hernandez v. New York* (1991) 500 U.S. 352, 365.)

Although Anderson has demanded a comparative analysis for the first time on appeal, he makes no attempt to provide his own comparison between challenged African-American jurors and seated non-African-American jurors to demonstrate that the prosecutor's reasons were pretextual. We note that Anderson merely points out that one of the prosecutor's reasons for striking Juror No. 7117, appearing sympathetic toward defendants due to their youth, applied equally to 10 other jurors who were *not* seated. If anything, Anderson's comparison tends to demonstrate the prosecutor's sincerity, not a pretext.

Cox complains that the state of the record makes a comparative analysis impossible, and both defendants contend that the inadequacy of the record requires reversal. Cox cites the general rule that "'"[a] defendant in a criminal case is entitled to an appellate record adequate to permit 'meaningful appellate review.'"' [Citation.]" (*People v. Galland* (2008) 45 Cal.4th 354, 370.) However, the right to an adequate record does not negate the "appellant's burden to present a record adequate for review

28

and to affirmatively demonstrate error." (*People v. Whalen* (2013) 56 Cal.4th 1, 84.) If parts of the record are missing, defendant must attempt if possible, to reconstruct them or obtain a settled statement. (See *People v. Osband* (1996) 13 Cal.4th 622, 661-663.) If not possible, reversal is not automatic, as the defendant must demonstrate just the inadequate record prejudiced him. (See *People v. Heard* (2003) 31 Cal.4th 946, 970.)

Cox does not claim that he attempted to obtain juror questionnaires, reviewed the court's minutes, requested information from the courtroom clerk, or attempted to obtain a settled statement drawn from the recollections of people present in court during voir dire. Instead, he suggests that he is relieved of his burden because the court reporter is to blame, having failed to properly identify all prospective jurors by badge number. On the contrary, his burden is not met by "simply citing an administrative dereliction." (*People v. Coley* (1997) 52 Cal.App.4th 964, 970.)

Moreover, as soon as defendants made their *Wheeler/Batson* objections, they were required to make a prima facie showing that jurors were challenged solely on the basis of their presumed group bias, and upon so doing, it was incumbent upon them to "'make as complete a record of the circumstances as . . . feasible.'" (*People v. Williams* (1997) 16 Cal.4th 153, 187; see also *Wheeler, supra*, 22 Cal.3d at pp. 278-281.) Surely the court reporter would have recorded each prospective juror by both badge and seat number if counsel had requested clarification of their identifications at the time they were questioned, excused, or seated. As defendants have shown no attempt to preserve or provide an adequate record and make no claim of prejudice, reversal is not required on this ground.

### 3. Genuineness of prosecutor's reasons

Anderson contends that the prosecutor's impression that Juror No. 7117 showed sympathy toward defendants was incorrect, and that her responses reflected "only curiosity." The trial court was apparently satisfied by the prosecutor's sincerity as well as her descriptions of Juror No. 7117's demeanor, negative body language when questioned by the prosecution, and positive body language when questioned by the defense. "It is well settled that '[p]eremptory challenges based on counsel's personal

29

observations are not improper.' [Citation.]" (*People v. Reynoso* (2003) 31 Cal.4th 903, 917.)  Thus, a prosecutor may rely upon even subtle body language, such as a smile or a glare, or the prospective juror's manner of answering questions.  (*Ibid.*)  The trial court was able to observe Juror No. 7117's demeanor, and apparently agreed with the prosecutor.  As we have only the transcript of the proceedings before us, we defer to the court's observations.  (See *Riccardi, supra*, 54 Cal.4th at p. 787; *Lenix, supra*, 44 Cal.4th at pp. 626-627.)

Anderson argues that the prosecutor based her challenge of Juror No. 7117 *solely* upon her demeanor and occupation as a data processor rather than an aerospace engineer, and failed to state any other race-neutral reasons.  Anderson exaggerates, as the prosecutor did not base her challenge solely on demeanor, nor did she express a bias against data processors.  Moreover, as respondent observes, Anderson has failed to consider the totality of the prosecution's reasons.  The prosecutor explained in detail why Juror No. 7117's words, demeanor, and body language appeared to demonstrate sympathy toward the defendants.  The prosecutor also described Juror No. 7117's behavior toward other prospective jurors, and explained that the juror did not appear to fit in and voiced her concerns that Juror No. 7117's claim to be retired from "aerospace" gave the impression she was exaggerating the importance of her occupation.

We agree with respondent that the cases cited by Anderson are inapposite, as all involved vague reasons unsupported by the sort of detailed and specific explanations supplied by the prosecutor in this case.  (See, e.g., *People v. Allen* (2004) 115 Cal.App.4th 542, 551-553 ["incomprehensible" reference to "demeanor" without any details]; *People v. Turner* (1986) 42 Cal.3d 711, 725 ["something in her work" which prosecutor could not remember]; *McCain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1223 ["patently frivolous" explanation that juror had her "elbow on her chair"].)

Anderson cannot meet his third stage *Wheeler/Batson* burden to show the prosecutor excused prospective jurors for discriminatory reasons merely by asserting "'that some of the nondiscriminatory reasons offered by the prosecutor are not supported by the record.' [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1049-1050.)  In any

30

event, the prosecutor's impression that Juror No. 7117 was sympathetic toward defendants was amply supported by the record. After the court reminded the jurors that defense counsel had inquired about the prospective jurors' first impressions upon entering the courtroom, the court asked the jurors to volunteer any impressions or thoughts that might interest the attorneys. Juror No. 7117 was the only one to volunteer her first impression. She told the court that upon first entering the courtroom, she thought, "[W]hat are three nice-looking, clean-cut men doing here? And I'm trying to figure out what they did." And she wondered, "What was the problem[?]"

We conclude that defendants have failed to demonstrate that the trial court's ruling was clearly erroneous, and find reversal of the convictions from the first trial is unwarranted. (See *Riccardi, supra*, 54 Cal.4th at p. 787.)

## C. Second trial

Anderson made another *Wheeler/Batson* objection in the second trial after the prosecutor challenged three African-American prospective jurors (Nos. 7215, 9331, and 0726). The court found the defendant made a prima facie showing and asked the prosecutor to justify the challenges.

The prosecutor explained that she excused Juror No. 7215 because the prospective juror was a young social worker who worked with the homeless and had worked with children in foster care. The prosecutor also challenged Juror No. 7215 because she had little life experience and had never heard of the presumption of innocence. These factors provide a reasonable basis for a peremptory challenge. (See *People v. Watson* (2008) 43 Cal.4th 652, 677; *People v. Sims* (1993) 5 Cal.4th 405, 430-431.)

As for Juror No. 9331, the prosecutor explained that when responding to an inquiry about negative experience with law enforcement, Juror No. 9331 revealed that he had been arrested in the past. The prosecutor reasonably construed his response as stating that his arrest was a negative experience. The California Supreme Court has "'repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement.' [Citations.]" (*Lenix, supra*, 44 Cal.4th at p. 628.)

31

Finally, the prosecutor challenged Juror No. 0726 because that prospective juror did not want to sit in judgment of another and said she felt she was being forced to do so. Juror No. 0726 also said her father had been murdered and she attended the trial every day. The prosecutor had the impression that although there was a conviction in the case of the father's murder, Juror No. 0726's other responses indicated that she had a problem with the justice system. "[S]kepticism about the fairness of the criminal justice system is a valid ground for excusing jurors. [Citations.]" (*People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386.)

The trial court found the reasons to be race-neutral, and expressly agreed with the prosecutor's assessments, particularly with regard to Juror No. 0726, who "was all over the place." Anderson does not contend that the trial court's ruling was unsupported by substantial evidence, although our review considers *only* whether substantial evidence supports the court's conclusions. (*Lenix, supra*, 44 Cal.4th at p. 613.)

Moreover, Anderson does not demonstrate substantial evidence of pretext. It is not the reviewing court's obligation to "examine the record in detail and determine independently whether the proffered reasons for the excusal were likely sincere." (*People v. Mai, supra*, 57 Cal.4th at p. 1049, fn. 26.) Anderson simply disagrees with the reasons the prosecutor gave, and briefly draws inferences that might support a contrary result.[10]

The burden to demonstrate purposeful discrimination remains with Anderson as the objecting party. (*Lenix, supra,* 44 Cal.4th at pp. 612-613.) That burden is not met by simply inviting this court to make a contrary finding, but requires an examination of *all* relevant circumstances, which "may often be open to more than one reasonable deduction. Thus, care must be taken not to accept one reasonable interpretation to the

---

**10** Anderson notes that the youthful social worker had a job, which suggests maturity, and she told the court she could be fair. Juror No. 9331, who had a negative experience with law enforcement, also said he could be fair, from which Anderson infers that he "got over it." Finally, Anderson did not agree that Juror No. 0726 had reservations about the justice system because she expressed satisfaction with the outcome of the trial of her father's murderer and she had served on two other juries which reached verdicts.

exclusion of other reasonable ones." (*Id*. at p. 627, see also pp. 626, 628.) Where, as here, "the trial court accepted explanations that are facially permissible, inherently plausible, and factually supported, and defendant cites no substantial evidence of pretext . . . , there is no reason on appeal to suspect a dereliction of duty by the trial court, or to *reverse* the presumption that the excusals were exercised legitimately . . . ." (*People v. Mai, supra*, 57 Cal.4th at p. 1049, fn. 26.) We find no error by the trial court.

## V. Kill zone instruction

Cox contends that there was insufficient evidence to justify a kill zone jury instruction in the second trial. The trial court read CALJIC No. 8.66.1, as follows: "A person who primarily intends to kill one person may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the kill zone. The intent is concurrent when the nature and scope of the attack while directed at a primary victim are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. Whether a perpetrator actually intended to kill the victim either as a primary target or as someone within the kill zone or zone of risk is an issue to be decided by you."

To be guilty of attempted murder, a defendant must intend to kill the alleged victim and commit a direct but ineffectual act toward accomplishing the intended killing. (*People v. Stone, supra*, 46 Cal.4th at p. 136.) "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.) The intent to kill multiple victims may be inferred when the defendant uses lethal force calculated to kill everyone within an area around the primary target as a means of ensuring the primary target's death. (*People v. Bland* (2002) 28 Cal.4th 313, 329.) Similarly, a defendant who directs lethal force at a group of people in close proximity "can be convicted of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill. [Citation.]" (*People v. McCloud, supra*, 211 Cal.App.4th at pp. 798-799; see also *People v. Houston, supra*, at p. 1218.) The term "kill zone" is merely shorthand for such

concurrent intent, which "is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent." (*People v. Bland, supra*, at p. 331, fn. 6.) Although the trial court is not required to give a kill zone instruction, it may do so when it is supported by the evidence. (See *People v. Stone, supra*, at pp. 137-138.)

Cox argues that there was no evidence that the shooter intended to kill everyone in front of the house, and he suggests that the shooter might only have intended to kill Farias and John Doe, or merely to frighten or harm one or the other. On the contrary, substantial evidence established that the shooter used a semiautomatic weapon to fire multiple shots at a small group of people a short distance away. Firing a single shot in the direction of a group will not ordinarily support multiple counts of attempted murder under a kill zone theory. (*People v. Perez* (2010) 50 Cal.4th 222, 225, 230-231.) And firing multiple shots at a very large group of people will not necessarily support an inference that the shooter intended to kill more people than the number of bullets fired. (See *People v. McCloud, supra*, 211 Cal.App.4th at pp. 802-807.) However, firing multiple shots directly at a small group at close range will give rise to a reasonable inference that the shooter intended to kill all in the group. (*People v. Garcia* (2012) 204 Cal.App.4th 542, 554.) Such was the case here. A kill zone instruction was thus appropriate, and the trial court did not err in reading CALJIC No. 8.66.1.

## VI. Conspiracy instruction

Anderson contends that the jury instruction regarding uncharged conspiracy was incorrectly modified by the trial court.

"[C]onspiracy is a specific intent crime requiring an intent to agree or conspire, and a further intent to commit the target crime." (*People v. Swain* (1996) 12 Cal.4th 593, 602.) "'[A]n uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' [Citations.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 150.)

34

The trial court modified CALJIC No. 6.22 to identify the target crime as attempted murder and instructed the jury in relevant part as follows: "Before you may use a conspiracy theory to convict any of the defendants of attempted murder, you must unanimously agree and find beyond a reasonable doubt, that (1) there was a conspiracy to commit the crime of attempted murder, and (2) a defendant willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy. You must also unanimously agree and find beyond a reasonable doubt that an overt act was committed by one of the conspirators."

Anderson correctly asserts that conspiracy to commit attempted murder is a nonexistent crime. (See *People v. Iniguez* (2002) 96 Cal.App.4th 75, 79-81 (*Iniguez*).) "'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. . . .' [Citation.]" (*People v. Houston, supra*, 54 Cal.4th at p. 1217.) "[U]nder a traditional conspiracy approach, one cannot conspire to *try* to commit a crime." (*People v. Johnson* (2013) 57 Cal.4th 250, 264.)

Anderson contends that the judgment must be reversed because the instruction was an incorrect statement of law. Respondent contends that Anderson forfeited this issue by failing to object to the modified instruction. Anderson does not deny that he failed to object to the instruction, but contends that the error affected his substantial rights and thus should be reviewed. (See *People v. Famalaro* (2011) 52 Cal.4th 1, 35; § 1259.) He argues that because there was a general verdict and the trial court also instructed with regard to the legally correct theory of aiding and abetting, it is impossible to determine whether the jury relied on that theory or the incorrect theory of liability in convicting him of attempted murder. He concludes that under such circumstances, reversal is required. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130 [reversal generally required when reviewing court cannot determine whether jury convicted in reliance on improper legal theory].)

Anderson relies on a case in which a *conspiracy* conviction was reversed because "[t]he conduct defendant pleaded to, conspiracy to commit attempted murder, is a

conclusive legal falsehood." (*Iniguez, supra*, 96 Cal.App.4th at p. 79.) Anderson has cited no case in which an attempted murder conviction has been reversed due to an instruction that, as an alternative to ordinary aiding and abetting principles, the jury could find derivative liability based upon an uncharged conspiracy to commit an attempted murder. As the modified instruction given here did not permit the jury to convict Anderson of conspiracy, *Iniguez* does not directly support Anderson's theory. However, as that court aptly pointed out, the crime of attempted murder requires a specific intent to actually commit the murder, while an agreement to commit attempted murder would contemplate no more than an ineffectual act, and "[n]o one can simultaneously intend to do and not to do the same act." (*Iniguez, supra*, 96 Cal.App.4th at p. 77.) By suggesting such an impossibility here, we conclude that the court's modification resulted in an *ambiguous* instruction.

We thus agree with respondent that whether the instruction was erroneous must be tested under the "reasonable likelihood" test applied to ambiguous instructions: whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. (See *People v. Benson* (1990) 52 Cal.3d 754, 801, citing *Boyde v. California* (1990) 494 U.S. 370, 378-381.) In applying this test, we determine "the meaning that the instructions *communicated to the jury*. If that meaning was not objectionable, the instructions cannot be deemed erroneous. [Citation.]" (*People v. Benson, supra*, at p. 801.) Further, "we do not view the instruction in artificial isolation but rather in the context of the overall charge. [Citation.]" (*People v. Mayfield* (1977) 14 Cal.4th 668, 777.)

The modified conspiracy instruction, taken in the context of the other instructions, made clear to the jury that defendants were not charged with the crime of conspiracy, that the conspiracy instructions provided an alternative to the prosecution's aiding and abetting theory, that the prosecution was required to prove that the coconspirator who committed the act harbored the specific intent to kill, and that all conspirators entertained the same intent when the defendant agreed to the criminal design. The court also instructed the jury that the crime of attempted murder was not committed by mere

36

planning, but by acts actually undertaken by "a person who intends to kill another person . . . where those acts clearly indicate a certain unambiguous intent to kill," and which would have been completed but for "some circumstances not intended in the original design." The court instructed the jury, in essence, that the conspirators must be found to have intended to kill and have intended for their original design to succeed, but the original design failed for an unintended reason.

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde v. California, supra*, 494 U.S. at pp. 380-381.) Thus, as other instructions made clear that liability could not be premised upon an agreement to kill the victims while also agreeing to fail at their attempt, and there is no indication in the record that the jury believed otherwise, we presume that the jurors did not engage in the kind of technical hairsplitting suggested by Anderson. We conclude that there is no reasonable likelihood that the jury misunderstood or misapplied the modified instruction. Thus the instructions cannot be deemed erroneous. (*People v. Benson, supra*, 52 Cal.3d at p. 801.)

Moreover, as the instruction was merely ambiguous, with no reasonable likelihood that the jury misunderstood or misapplied the modified instruction, coupled with the overwhelming evidence which established that Anderson shared Cox's intent to kill the young men on the porch, the modification was harmless under any standard. (See *People v. Beltran* (2013) 56 Cal.4th 935, 955-956.) Although the bullets recovered from the scene had been fired from the Glock handgun linked to Cox, Anderson was armed as well with the jammed assault weapon that Farias thought was an Uzi. In addition, Farias identified both defendants as the men who approached within a few feet of the porch, where he saw Anderson fire his gun after loading it with an ammunition clip. Firing a

37

semiautomatic weapon from a few feet of a person or persons creates a strong inference that the shooting intended to kill whoever was within point-blank range, and the fortuitous jamming of the weapon does not weaken that inference. (*People v. Lee* (1987) 43 Cal.3d 666, 677-679.)

## VII. Sufficiency of gang evidence

Anderson contends that the gang enhancement was unsupported by substantial evidence.

The finding of a gang enhancement is reviewed under the same substantial evidence standard as any other conviction. (See *People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) Thus, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*Ibid.*)

A finding under section 186.22, subdivision (b)(1), has two elements: (1) the crime was committed for the benefit of any criminal street gang, or in the alternative, at the direction of or in association with any criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*Albillar, supra*, 51 Cal.4th at pp. 64-65, 67-68.) The association alternative of the first element may be established with substantial evidence of the intentional commission of the crime in concert with a known gang member. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; see *Albillar*, at pp. 61, 67-68.) As to the second element, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer

that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, at p. 68.)

It is unclear whether Anderson is challenging the evidence supporting the first element of the gang enhancement, the second element, or both, as he has not challenged the overwhelming evidence that all three defendants were members of the Five Tres Avalon Gangster Crip criminal street gang, nor has he challenged the sufficiency of the evidence establishing that the three defendants participated in the crime knowing that each other participant was a gang member. Thus, under the evidence which Anderson has failed to challenge as insubstantial, the jury could reasonably infer both elements of the enhancement: that defendants committed the crime in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members.

Moreover, as respondent observes, Anderson has failed to set forth all the evidence favorable to the judgment to demonstrate its insufficiency.[11] Anderson's argument consists of pointing out flaws in the gang expert's opinion and the absence of certain facts that would better support that opinion, and of suggesting that we reweigh the evidence and draw inferences less favorable to the jury's finding. It is Anderson's burden as the appellant to demonstrate that the evidence is insufficient to support the judgment, and he does not meet that burden "by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

---

[11]  In reply, Anderson does not deny the accuracy of respondent's observation, but claims that it is unjustified because if a defendant were prevented from "marshaling his own evidence" in this manner, he would be foreclosed from "point[ing] out the constitutional deficiencies in the People's evidence" and could never prevail on a substantial evidence challenge on appeal. We have found no authority to disregard the standard of review set forth by our high court in *Albillar*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

39

Nevertheless Anderson attempts to do just that by arguing "[t]he shooting lacked all recognized indicia of a gang-related crime" because there was no evidence that the car used in the crime was stolen, or of a prior gang challenge, gang signs, shouting out the name of the gang, or bragging by the gang afterward.  Anderson contends that the gang "expert conceded that there is no evidence that a shooting was for the benefit of or in association with a gang when two men walk up to a house and fire at three people, when there is no evidence that anyone called out a gang name or flashed gang signs[,] there is no graffiti . . . and none of the [victims] were gang members."  Anderson exaggerates the expert's so-called "concession."  Defense counsel's hypothetical facts did not include all the relevant facts in evidence as the prosecutor's hypothetical facts did, such as the shooters' membership in the same gang, the location of the crime in rival gang territory, the fact that the victims were a group of young men, the classic gang-style walk-up shooting after a disrespectful shout, and untraceable paper plates on the getaway car.

After disregarding such facts underlying the expert's opinion, Anderson concludes that the gang expert's testimony was insufficient to support the finding, because it "was opinion, not evidence."  In fact, a gang expert's opinion based upon the facts in evidence *is* evidence:  "It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation.  [Citation.]"  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930; see also *People v. Gardeley* (1996) 14 Cal.4th 605, 618.)  And expert opinion may be sufficient to prove that a crime was gang related and committed with the intent to benefit a gang.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048-1049; *Albillar, supra*, 51 Cal.4th at p. 63.)

Here, the gang finding was amply supported by the expert opinions of Officers Drenckhahn and Fransen, as well as the officers' personal experiences with Cox, Anderson, and Brown in the neighborhood of the Five Tres Avalon Gangster Crip gang.  The defendants were admitted members of the gang, and had been seen by one or both of the officers in the company of other self-confessed members of the Five Tres Avalon Gangster Crip gang, wearing the gang's colors and celebrating the gang's special day.

40

Both Cox and Anderson had gang related tattoos. Officer Fransen explained that in gang culture, publicly associating with other known members of the gang within their territory was a sign of allegiance to that gang. According to Officer Drenckhahn, gang related tattoos also demonstrated allegiance to the gang.

In addition, Officer Drenckhahn explained that when active members of criminal street gangs go on missions to commit crimes in rival gang territory, they typically bring fellow gang members with them to verify their work on behalf of the gang and for overall support. It is also customary to target known rivals or anyone fitting the description of a rival gang member. Here, defendants showed contempt for four young men in rival gang territory by yelling something like, "Fuck these fools," just before they shot. In response to a hypothetical question mirroring the evidence in this case, Officer Drenckhahn opined that the crime was a classic mission-type shooting, and that such a crime would benefit the gang by creating an atmosphere of fear in the community, leading residents to refuse to cooperate with the police or to identify gang members. It made no difference that the gang members did not call out the gang's name while committing the crime, as Officer Drenckhahn knew from experience such calling out did not always occur during gang missions.

We conclude that substantial evidence supported both elements of the gang enhancement and we are not persuaded otherwise by Anderson's comparison to cases in which the evidence was insufficient.[12] Comparison with such cases is rarely helpful in a substantial evidence review, as every case necessarily depends on its own facts. (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

---

[12]    See *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 (no evidence the crime committed was one of gang's activities); *People v. Albarran* (2007) 149 Cal.App.4th 214, 228 (*Albarran*) (no substantial evidence issue; gang evidence held irrelevant to the charges and extraordinarily prejudicial); *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 (crime not committed in gang territory or with another gang member); *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647 (handgun possession improperly based on expert's opinion that gang members possessed guns in common), disapproved in part in *People v. Vang*, *supra*, 52 Cal.4th at pages 1047-1048 and footnote 3.

## VIII. New trial motions

Anderson contends that the trial court erred in denying defendants' motions for new trial, because the prosecution failed to present sufficient evidence that the crimes were gang related before presenting unduly inflammatory gang evidence that was thus immaterial to any issue in the case. Cox's counsel made the oral motion for new trial in which Anderson's counsel joined. Anderson relies on a comparison to *Albarran*, arguing that the prosecution failed to prove a "tie-in to gangs" or present evidence of a gang challenge; and he again argues that the gang expert's ambiguous "concession" to an incomplete hypothetical question posed by defense counsel demonstrates that the gang evidence was insufficient.

When the issue involves sufficiency of the evidence, the denial of a motion for new trial is reviewed for an abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.) "The court has broad discretion in ruling on a new trial motion, and the court's ruling will not be overturned absent a clear and unmistakable abuse of that discretion. [Citation.] The court abuses its discretion, however, where it misconceives its duty, applies an incorrect legal standard, or fails to independently consider the weight of the evidence. [Citation.]" (*People v. Carter* (2014) 227 Cal.App.4th 322, 328.)

Citing *People v. Nesler* (1997) 16 Cal.4th 561, and *Albarran*, Anderson contends that we must conduct a de novo review of the trial court's ruling. In *Nesler*, the California Supreme Court concluded that de novo review is appropriate for the denial of a defendant's motion for a new trial on grounds of juror misconduct. (See *Nesler, supra*, at p. 582, fn. 5.) In *Albarran*, the appellate court construed *Nesler* as requiring de novo review whenever the issue implicated a significant constitutional issue, and found that the trial court's *partial* new trial grant presented the sort of rare and unusual circumstance implicating such a significant constitutional issue. (*Albarran, supra*, 149 Cal.App.4th at pp. 224 & fn. 7, 232.)

It is Anderson's position that the significant constitutional issue requiring a de novo review arose in this case from the trial court's failure to bifurcate the gang enhancement from the rest of the trial. Anderson claims that in the jury's consideration

42

of highly inflammatory but insufficiently probative gang evidence on the issue of guilt was the result of the decision. However, no motion to bifurcate was made in the second trial. Brown moved to sever the gang enhancement in the first trial, and defendants joined in the motion, but they did not renew it in the second trial. Although counsel for Cox mentioned the previous motion in arguing the new trial motion, his stated ground for the new trial motion was "the issue of the gang evidence." Counsel cited *Albarran* and argued that the gang enhancement was not supported by substantial evidence, because "two guys walk up, no gang names, no gang signs, no gang graffiti, nothing, two guys walk up and start shooting." Counsel also complained that the prosecutor had represented that such evidence would be presented, but in the end, it was not.

Thus the issue was the sufficiency of the gang evidence, which we review for abuse of discretion. (See *People v. Fuiava, supra*, 53 Cal.4th at p. 730.) We find no error under any standard of review. We agree with the trial court's rejection of any suggestion that *Albarran* was "some type of seminal case" holding that gang evidence is insufficient as a matter of law unless it includes such facts as "shout-outs" of gang names or the use of gang signs or graffiti. And we further agree with the trial court that the gang evidence was sufficient to prove the gang enhancement despite the absence of such identifying indicia. In giving its reasons for denying the motion for new trial, the trial court summarized evidence establishing that defendants were three gang members who went together in a car without license plates to a rival gang area, where one of them committed the kind of walk-up shooting normally associated with gang shootings.

Based upon the same evidence, we concluded in the previous section of this Discussion that substantial evidence supported both elements of the gang enhancement. For the same reason we agree that the gang evidence was properly admitted and not unduly prejudicial. The trial court did not abuse its discretion or otherwise err in denying the motion for new trial.

## IX. Cumulative error

Anderson contends that the cumulative effect of all the asserted errors was to deny him a fair trial. Because "[w]e have either rejected on the merits defendant's claims of

43

error or have found any assumed errors to be nonprejudicial," we must also reject any claim of prejudicial cumulative effect. (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT